UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LAWRENCE M. NAGER,

        Plaintiff,

v.                                      Case No. C-1-04-044

THE CINCINNATI ENQUIRER,

        Defendant.

### ORDER

This matter is before the Court upon defendant's motion for summary judgment (doc. 17), plaintiff's opposing memorandum (doc. 29), and defendant's reply (doc. 37). The parties have filed proposed findings of fact and conclusions of law, which the opposing side has highlighted as true, false, or irrelevant (docs. 35, 38).

### I. Procedural and factual background

Plaintiff Lawrence Nager, a resident of the State of Ohio, brings this action against The Cincinnati Enquirer, his former employer, under the Court's diversity jurisdiction. Plaintiff brings claims for age discrimination, gender discrimination, and retaliation under Ohio statutory law, Ohio Rev. Code § 4112.02. Plaintiff alleges that defendant unlawfully terminated him on

1

account of his age and gender and that defendant retaliated against him for engaging in protected activity, i.e., complaining about defendant's discriminatory treatment of a co-worker, by treating plaintiff less favorably than similarly-situated, less qualified individuals who had not engaged in protected activity and by terminating plaintiff's employment. As relief, plaintiff requests that defendant be enjoined from further unlawful conduct, that he be reinstated to his employment effective January 9, 2004, and that he be awarded lost pay and benefits, compensatory damages, and punitive damages.

## II. Summary judgment standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. **Celotex Corp. v. Catrett**, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." **Anderson v. Liberty Lobby,** 477 U.S. 242, 248 (1986) (quoting **First Nat. Bank of Arizona v. Cities Serv. Co.,** 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. **Anderson,** 477 U.S. at 255 (citing **Adickes v. S.H. Kress & Co.,** 398 U.S. 144, 158 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. **Anderson,** 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return

a verdict for that party. *Id.* at 249 (citing *Cities Serv.,* 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.,* 391 U.S. at 290, judgment may be granted. *Anderson,* 477 U.S. at 249.

### III. Undisputed facts

1. Plaintiff Lawrence Nager was a music critic for *The Cincinnati Enquirer (Enquirer)* in the Features Department from November 27, 1995 until his discharge on January 9, 2004. As the pop music critic, Nager wrote features, news stories, and a weekly column about local pop music and nightlife in the paper's "Tempo" section.

2. Plaintiff is a musician with a good working knowledge of music who knows many big name musicians. He is particularly well-qualified to write about pop music, which includes pop, rock, R & B, rap, jazz, country, bluegrass, folk, and ethnic music. He possesses a great array of contacts in the national and local music industry, has written for major national and local publishers, and is a professional musician himself.

3. Plaintiff was hired by Ann Hicks, age 57, his direct supervisor throughout his employment, and Sara Pearce, age 51, who was Hicks's supervisor during plaintiff's employment.

4. Plaintiff was 43 years old in January of 1996 and had just turned 50 at the time of his discharge in January of 2004.

5. Plaintiff was at all times an employee-at-will. He had no employment contract for any fixed term or duration.

6. The Features Department is essentially the "Tempo" section of the newspaper. It falls under the News Division, which includes other departments like Sports, Metro, Suburban, Graphics, News Desk, and Editorial.

7. Plaintiff "met standards" in his May 27, 1998 performance review. Hicks noted areas where plaintiff needed to improve and worked with him over the next three months to improve in four areas: accuracy, meeting deadlines, managing time, and working with his editor to develop stories.

8. Although plaintiff's performance reviews for 1999 and 2000 were for the most part positive, Hicks again identified problems with meeting deadlines, organizing stories, and enterprising story ideas in those performance reviews.

9. Hicks dropped plaintiff's performance rating from an "above standards" rating in 2000 to "meets expectations" in 2001.

10. Hicks observed that plaintiff treated his position as a "day job" and was not getting out on his beat to see what was happening. Hicks had concerns about plaintiff's knowledge of local bands as he was not getting the bigger stories on them, he rarely wrote stories about clubs in the suburbs, and he did not seem to know things that one would know if he were out there listening. Hicks wanted plaintiff to vary and widen the newspaper's coverage and not write about the same places. Another consistent problem was that plaintiff missed or pushed deadlines. At one point, Hicks asked plaintiff to do a log of what he was doing all day to see what was causing him to miss deadlines.

11. Plaintiff's performance review dated May 27, 2002, was similar to his 2001 performance review.

12. On November 20, 2002, Tom Callinan, a 55-year old male, took over as the Executive Editor of the News Division, replacing Ward Bushee, a 54-year old male.

13. When Callinan arrived, he studied the results of a recent readership survey from October 2002 that reflected low readership and low reader satisfaction. The survey revealed that very low numbers of females and young people between the ages of 18 and 34 routinely read the *Enquirer*. In response to the survey results, Callinan began a repositioning project in the summer of 2003 that moved personnel and resources into local news.

14. Plaintiff was rated "below standard" in his May 27, 2003 performance review. Hicks wrote in the review that for the next three months, plaintiff would meet weekly with his editor to discuss stories he was working on and he would be given "a monthly update on how he is doing for the next three months at which point he will be re-evaluated and a salary increase considered."

15. In late May 2003, Margaret Buchanan, a 46-year old female, took over as Publisher of the *Enquirer*.

16. Buchanan shared Callinan's concerns about the decline in readership and the results of the readership survey. They believed that improvements and change were needed to reverse this trend.

17. On August 27, 2003, Hicks re-evaluated plaintiff. She prepared a Written Warning and another Performance Improvement Plan (PIP), which was given to plaintiff in the same meeting. The Written Warning/PIP given to plaintiff included this statement:

> As noted above, this is a written warning and you are being placed on a 60-day performance improvement plan. This plan addresses the areas where you do not meet standard. The failure of immediate and sustained improvement in your performance will result in further disciplinary action up to and including termination of employment.

Areas of improvement included communications/teamwork, coverage of his beat, and planning/assignments.

18. On August 29, 2003, the Head of the News Division, Callinan, weighed in on plaintiff's performance problems in an e-mail message:

> Not sure how this beat has been viewed in the past but this is one of our most important beats to drive readership. The Enquirer's performance with younger readers (16% l8-24s and 21% 25-34's) is declining beyond national averages. We need to make building readership among this target (435,000) a top priority and the music/nightlife area is key...

19. Just two days after receiving the performance re-review, written warning, and PIP and being told again about the importance of organization and planning, plaintiff complained to Hicks about his planning responsibilities, saying that "planning inhibits [his] ability to be fresh and spontaneous."

20. On September 16, 2003, Hicks told plaintiff again that the PIP was serious. Plaintiff asked Hicks if he should be looking for employment elsewhere.

21. In a September 26, 2003 e-mail to plaintiff, Hicks reiterated matters she and plaintiff had discussed earlier. Hicks stated that she had been "shocked and dismayed" to see that plaintiff's assignment file had not been updated. She reminded plaintiff that he was on a PIP, that the assignment files were his top priority, that assignment files and how to fill them out had been explained to plaintiff many times, and that this was a serious matter.

22. Callinan transferred John Kiesewetter, the Features TV reporter, to the Suburban Bureau as the sole reporter covering the growing Butler County area. Many people in Features were sad to see Kiesewetter move.

23. Hicks issued plaintiff a Final Written Warning on November 19, 2003, and extended the warning period again. This warning summarized the problems and prior attempts to improve performance, including the re-review, the Written Warning, and the PIP.

24. Hicks informed plaintiff that since the PIP had begun in August, plaintiff had experienced ongoing problems with the assignment file, that he needed to identify and plan coverage for "the big things in the next six weeks," and that his performance in noted areas had not improved since the written warning and the implementation of the PIP. Hicks advised plaintiff that the PIP had been extended 30 days, that failure to improve his performance would result in termination of employment, and that if he did not meet the points detailed in the PIP, his employment could be terminated prior to the end of the 30 days. Hicks stated that she would meet with plaintiff on a weekly basis to review his performance and offer suggestions for improvement.

25. Plaintiff was on vacation from December 13, 2003 until January 2, 2004. On December 10, 2003, before plaintiff left for vacation, Hicks had given him a "Performance Update" as a follow-up to the November 19, 2003 Final Written Warning, informing plaintiff that his performance had not improved. Hicks advised plaintiff that his job was in jeopardy and that he must improve his performance immediately. Hicks stated that before leaving on vacation, plaintiff's assignment file had to be updated for the next six weeks out. Hicks reiterated that "It is critical that you perform the essential functions of your job or you will be terminated, as noted in the final warning given to you on 11/19/03."

26. The day before plaintiff left for vacation, Hicks again went over his assignment file with him.

27. Hicks told Pearce and Ruben Montoya, the Vice-President of Human Resources, about the continued performance problems and told them that plaintiff refused to do what he was being asked to do.

28. Upon his return to work on January 2, 2004, Hicks told plaintiff that the PIP had not expired and that he still needed to be very diligent. She told plaintiff that he had missed a story at the Fraze Pavilion in Dayton that had local ties.

29. After Hicks consulted with Montoya, Callinan, and Buchanan about plaintiff, his employment was terminated on January 9, 2004.

30. On June 1, 2004, plaintiff began working for the *Kentucky Challenger* as a news editor at essentially the same rate of pay he had received from the *Enquirer*. Plaintiff continues to work in that position.

31. Defendant posted a job opening for a music/nightlife reporter to replace plaintiff. Eventually, on May 24, 2004, defendant hired Cynthia Hanifin.

### IV. Applicable law

### A. Age and gender discrimination

Ohio law prohibits age and gender discrimination in employment decisions. Under the law of this Circuit, the same evidentiary framework applicable to discrimination claims brought under Title VII and the ADEA applies to discrimination claims brought under state law. *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992). A plaintiff claiming discrimination under these statutes may establish a prima facie case by introducing either direct or circumstantial evidence that the defendant discharged the plaintiff because of his membership in a protected class. *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824 (1973); *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1081 (6th Cir. 1994). Plaintiff may establish a prima facie case of discrimination through circumstantial evidence by showing that: 1) he was a member of a protected class; 2) he suffered an adverse employment action; 3) he was qualified for the position lost or not gained; and 4) he was replaced by someone outside of the protected class or, in the case of age discrimination, by a substantially younger individual within the protected class. *Manzer,* 29 F.3d at 1081 (citing *McDonnell Douglas,* 411 U.S. at 802; *Gagne v. Northwestern Nat. Ins. Co.,* 881 F.2d 309, 313 (6th Cir. 1989); *O'Connor v. Consolidated Coin Caterers Corporation,* 517 U.S. 308, 313, 116 S.Ct. 1307, 1310 (1996).

A person is replaced when another employee is hired or reassigned to perform the individual's duties. ***Barnes v. GenCorp, Inc.,*** 896 F.2d 1457, 1465 (6th Cir. 1990). An individual is not replaced when another employee is assigned to perform the individual's duties in addition to his other duties or when the work is redistributed among other existing employees already performing related work. ***Id.***

Plaintiff may also establish the fourth prong of a prima facie case by showing that he was treated less favorably than a similarly-situated employee outside of his protected class. ***Clayton v. Meijer, Inc.,*** 281 F.3d 605, 610 (6th Cir. 2002) In such a case, plaintiff must prove that all relevant aspects of his employment situation were similar to those of the employee with whom he seeks to compare himself. ***Ercegovich v. Goodyear Tire & Rubber Co.,*** 154 F.3d 344, 352 (6th Cir. 1998). To be similarly situated in a disciplinary context, the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating or mitigating circumstances which would distinguish their conduct or the employer's treatment of them for that conduct. ***Id.*** at 352 (citing ***Mitchell,*** 964 F.2d at 583).

During the prima facie stage, the court should focus on the plaintiff's objective qualifications to determine whether he was qualified for the relevant job. ***Wexler v. White's Fine Furniture***, 317 F.3d 564, 575 (6th Cir. 2003). The plaintiff may demonstrate that he was qualified by presenting credible evidence that his qualifications are at least equivalent to the minimum objective criteria required for employment in his field. ***Id.*** at 575-76. The inquiry should focus on criteria such as education, experience in the industry, and possession of the required general skills. ***Id.*** at 576.

The plaintiff's burden at the prima facie stage of the proceedings is not onerous, but "merely serves to raise a rebuttable presumption of discrimination by 'eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff].'" ***Cline v. Catholic Diocese of Toledo***, 206 F.3d 651, 660 (6th Cir. 2000) (citing ***Hollins v. Atlantic Co.,*** 188 F.3d 652, 659 (6th Cir. 1999) (quoting ***Texas Dept. of Community Affairs v. Burdine,*** 450 U.S. 248, 253-54, 101 S.Ct. 1089 (1981)).

The employer is entitled to summary judgment if the plaintiff does not establish a prima facie case. ***Mitchell,*** 964 F.2d at 582-84. If the plaintiff establishes a prima facie case, the employer can overcome the prima facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. ***McDonnell Douglas,*** 411 U.S. at 802, 93 S.Ct. at 1824. If the employer carries its burden, the plaintiff must prove by a preponderance of the legal evidence that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination. ***Burdine,*** 450 U.S. at 253, 101 S.Ct. at 1093. Plaintiff has the ultimate burden of proving that his membership in the protected class was a determining factor in the adverse employment decision. ***Chappell v. GTE Products Corp.,*** 803 F.2d 261, 265 (6th Cir. 1986).

A court may not consider the employer's alleged nondiscriminatory reason for the adverse employment action at the prima facie stage but must instead at that point examine the plaintiff's case independent of the reason offered by the defense. ***Wexler***, 317 F.3d at 574-75; ***Cline***, 206 F.3d at 660-661. The court's consideration of the nondiscriminatory reason offered by the defendant is properly reserved for the second stage of the ***McDonnell Douglas*** analysis. ***Cline,*** 206 F.3d at 662. Otherwise, the plaintiff loses the opportunity to demonstrate that the defendant's nondiscriminatory reason for the adverse employment action is "in actuality a

11

pretext designed to mask discrimination." ***Wexler,*** 317 F.3d at 574 (citing ***Cline,*** 206 F.3d at 660-61).

The same actor inference permits, but does not require, a jury to infer that no discrimination occurred based on the fact that the same person both hired and fired the employee. ***Wexler,*** 317 F.3d at 572. The inference is insufficient to warrant summary judgment if the plaintiff has otherwise raised a genuine issue of material fact. ***Id.*** at 573-74.

### B. Retaliation

Ohio Rev. Code § 4112.02(I) makes it an unlawful employment practice for an employer to discriminate against an employee because the employee has opposed any "unlawful discriminatory practice" defined in that section. To prove a claim of retaliation, plaintiff must demonstrate that (1) he engaged in protected activity; (2) he was the subject of an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. ***Thatcher v. Goodwill Industries of Akron,*** 117 Ohio App.3d 525, 534-35, 690 N.E.2d 1320 (1997).

To establish a causal connection, plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had plaintiff not engaged in protected activity. ***Nguyen v. City of Cleveland,*** 229 F.3d 559, 563 (6th Cir. 2000). Evidence that defendant treated the plaintiff differently from similarly-situated employees or that

the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Id.*

Once plaintiff establishes a prima facie case of retaliation, the burden is on defendant to articulate a legitimate reason for the adverse action, which plaintiff may rebut by producing credible evidence of pretext. ***Chandler v. Empire Chem., Inc., Midwest Rubber Custom Mixing Div.,*** 99 Ohio App.3d 396, 402, 650 N.E.2d 950, 954 (1994).

### V. Opinion

### A. Discrimination

Plaintiff has come forward with sufficient evidence to raise a genuine issue of material fact as to the elements of a prima facie case of age and gender discrimination. Plaintiff is a male who was over age 40 at the time of his discharge; plaintiff was objectively qualified for his position; and plaintiff was terminated. Whether plaintiff was replaced by a female who was outside of the protected age group is a question of disputed fact that cannot be resolved on summary judgment. Accordingly, defendant is not entitled to summary judgment on the ground that plaintiff has failed to demonstrate a prima facie case of discrimination.

Defendant has articulated legitimate business reasons for plaintiff's discharge. Plaintiff has come forward with evidence that calls into question whether the proffered reasons for his discharge are the true reasons, or whether they are a pretext for age and/or gender discrimination. First, plaintiff has challenged the articulated reasons as factually false and has submitted evidence to support his position. For instance, plaintiff testified at his deposition that Hicks informed him before he went on vacation in December of 2003 that the assignment file he had

13

prepared for the coming weeks "was a good assignment file." Pltf.'s depo., p. 95. Plaintiff's testimony and proffered evidence on this and other matters regarding his job performance raises an issue as to whether his alleged failure to plan properly and to maintain an acceptable assignment file were true reasons for his discharge. Second, the record includes evidence that suggests that defendant was seeking to appeal to younger and female readers by adding individuals from this demographic to its staff. Among this evidence is the following excerpt from a paragraph entitled "Coverage from people just like them" contained in a 2001 resource guide on "How Gannett Newspapers are reaching Generation X" published by the Gannett News Department and Gannett News Service: "Gen Xers are a skeptical lot. They're not going to buy into a music review written by a Boomer, but they will take the advice of an Xer. Try to incorporate more young columnists into your coverage . . ." (Exh. 7 to Pltf.'s opposing memorandum). This statement and evidence of a similar nature contained in the record raise a question as to whether defendant sought to achieve its goal of appealing to younger, female readers by replacing plaintiff with a young, female columnist. It is not for the Court to weigh the evidence on these issues. Rather, these are matters for the jury to decide based on credibility determinations and the resolution of disputed facts. For these reasons, defendant is not entitled to summary judgment on plaintiff's discrimination claims.

B. Retaliation

Plaintiff has not come forward with sufficient evidence to avoid summary judgment on his retaliation claim. Plaintiff generally alleges that when Features Editor Sara Pearce asked during a staff meeting why morale was so low, plaintiff replied that "it's because of John Kiesewetter and the way he was treated," and that "people generally did not feel this was fair." Pltf.'s depo., pp. 174-75; see also Affidavit of Margaret McGurk, exh. 13 to doc. 29. Plaintiff does not allege that he expressed a belief that the treatment was unfair because it was discriminatory. His general assertion that people were unhappy because they believed Kiesewetter had been treated unfairly cannot reasonably be construed as opposition to a discriminatory employment action, and plaintiff's retaliation claim must fail for this reason.

VI. Conclusion

Defendant's motion for summary judgment is **GRANTED** as to plaintiff's claim for retaliation. The motion is **DENIED** with respect to plaintiff's claims of age and gender discrimination. The case will proceed to trial on the discrimination claims in accordance with the schedule established by the Court.

**IT IS SO ORDERED.**

S/ Herman J. Weber
Herman J. Weber, Senior Judge
United States District Court

J:\HJWA\04-044dicrmsjPUB.wpd